United States District Court
Southern District of Texas
**ENTERED**
March 28, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CURTIS LAWRENCE d/b/a SKYWARD TRANSPORTATION, INC., | § § | |
| Plaintiff/Counter-Defendant, | § § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-04236 |
| | § § | |
| FRESH DEL MONTE PRODUCE, INC. a/k/a DEL MONTE FRESH PRODUCE (TEXAS), INC., | § § | |
| Defendant/Counter-Plaintiff. | | |

This case came on for a bench trial on December 14, 2023 and concluded on December 19, 2023. All of the parties were present at trial. The Court has carefully considered the testimony of the witnesses, the exhibits entered into evidence, and the entire record, and hereby enters the following conclusions of fact. To the extent any conclusion of fact may be construed as a conclusion of law (or vice versa), the Court hereby adopts it as such.

## FINDINGS OF FACTS

### The Relationship between Skyward and FDM

1. Defendant/Counter-Plaintiff Fresh Del Monte Produce, Inc., ("FDM"), is the shipper of produce. FDM's customers buy produce from FDM. FDM then hires carriers to transport the produce.

2. Plaintiff/Counter-Defendant, Curtis Lawrence ("Lawrence") is African American and

the President and sole owner of Skyward Transportation, LLC, ("Skyward"). Skyward is a carrier that transports produce for FDM.

3.  In 2018 Skyward began transporting produce for FDM. Skyward obtained work from FDM by bidding on routes as a carrier with FDM. In January 2020 Skyward bid to serve as a FDM prime carrier on fourteen routes pursuant to a request for bid issued by FDM.

4.  It is unclear whether Skyward was the lowest bidder on all the routes it bid on. However, while the lowest bid was one of the factors considered by FDM in making its award decision, it was not the primary factor. Other factors were considered by FDM in awarding the routes. None of these factors included or considered the award of the route based on the race of the owners of the carriers.

5.  Skyward was not treated differently from other carriers during the bidding process for routes.

6.  FDM never represented to Skyward that being qualified to run loads for FDM and being the lowest bidder would automatically result in Skyward being awarded the routes that it bid on.

7.  Cristobal Villafranca ("Villafranca"), FDM's Transportation Manager in Dallas, Texas, did not treat Lawrence or Skyward any differently from other carriers based on Lawrence's race. Nor did any other employee or manager at FDM treat Lawrence or Skyward any differently from other carriers based on Lawrence's race. Specifically, FDM did not engage in racially disparate treatment of Lawrence or Skyward with respect to the bidding process, invoice payment process or the performance of any

contract between the parties as Skyward has alleged in this case. Although Skyward was awarded work through the bid process, Lawrence was not pleased that Skyward did not get all the work from FDM that it wanted to perform. Lawrence believed that Skyward was entitled to be awarded more routes as result of the quality of work that it had performed in the past for FDM.

### The Performance of the Contract Between Skyward and FDM

8. All of the transportation services performed for FDM was done pursuant an agreement between FDM and Skyward to transport loads of produce. Pursuant to this agreement, the Motor Carrier Service Agreement between FDM and Skyward ("Agreement"), Skyward was responsible for: (1) ensuring equipment was in suitable operating condition, (Articles 6.1 and 6.3)[1]; (2) using reefer equipment with 24-hour monitoring; (Article 6.3); and (3) maintaining precooled trailers.

9. Skyward was also required to maintain shipping documentation, including payment invoices, insurance coverage, bills of lading ("BOL") for proof of delivery ("POD") (Article 6.3.2), and service invoices based on agreed upon rates within 180 days of delivery date (Article 11.1).

10. When customer complaints arose, Skyward was required to work with FDM to resolve the issues, including acknowledging liability for loss of or damage to any product Skyward shipped (Article 9.1.1), and acknowledging freight within 30 days, and paying or resolving the claim within 90 days (Article 9.19). *Id*.

---

[1] The article numbers refer to the provisions of the Agreement at issue.

11. FDM was responsible for two contractual obligations relevant to this lawsuit: (1) paying the carrier's invoices for completed services within 30 days of invoice submission, including all required paperwork (Article 7.2); and (2) investigating customer claims against a carrier to determine, in FDM's sole discretion, whether the produce shipment was injurious to health and rejecting any such shipment (Article 9.1.8). *Id*.

12. FDM trained Skyward on the proper submission of invoices under the Agreement. Skyward understood to get paid, it had to submit invoices and POD receipts for each hauled load through FDM's Carrier Payment Portal. Lawrence and Skyward were aware that invoices were required to be submitted within 180 days of the delivery date in order to receive payment.

13. When any carrier attached a PDF of the invoice, FDM required the following information to be on the face of the invoice: (1) carrier name and remit to address; (2) bill to and ship to details; (3) bill to must be Del Monte Fresh Produce N.A., Inc.; (4) FDM's Order Number or Load/Trip Number; and (5) breakdown and description of all charges being billed along with total amount due.

14. In addition, Skyward was required to attach FDM's BOL signed by Skyward indicating customer acceptance of the product and a POD signed by the customer showing the product was delivered (collectively referred to as the "Invoice").

15. After Skyward submitted an Invoice on the Carrier Payment Portal, it could always review whether payment was pending or its approved status.

16. If FDM rejected an invoice, the carrier received an automated email advising: (1)

invoice was rejected; (2) rejection reason; and (3) instructions on how to resubmit the invoice accurately. Pursuant to the Rejected/Returned Invoice Policy, FDM did not retain the original rejected invoice. The carrier was responsible for resubmitting a new Invoice in compliance with the policy.

17. FDM trained Skyward repeatedly on these invoicing requirements and best practices.

18. Skyward was familiar with the Agreement and agreed to be bound by its terms.

19. Lawrence and his co-worker, Reginald Alexander, were trained by FDM's Accounts Payable Manager, Denise Marshall regarding the process for Skyward to be paid for hauling loads of produce.

20. However Skyward failed to follow FDM's invoicing process with respect to all of its loads. Between November 2018 to May 2020, FDM rejected invoices for these reasons: (1) PODs missing receiving/cosignee signature; (2) no bill from (company name) on invoice; (3) incorrect POD submitted – does not match load; (4) incorrect invoice number entered; (5) accessorials still pending approval to bill;[2] (6) incorrect invoice date; (7) missing PODs; (8) incorrect invoice number entered – no special characters, dashes, or spaces; (9) incorrect deduction on invoice for POD research fee; (10) POD missing receiving sticker; (11) invoice underbilled; (12) trip/Order referenced on invoice does not match submitted PODs; (13) trip not tendered cannot process – contact traffic coordinator to resolve issue; (14) wrong invoice attachment uploaded; and (15) underbilled – Line Haul ("Rejected Invoices").

---

[2] An accessorial is an additional charge to a shipper for services outside of normal transportation invoice.

21. In addition, FDM's records reflect Skyward never submitted 180 invoices after hauling the loads ("Unsubmitted Invoices").

22. Skyward was aware of the deficiencies and its failure to submit invoices to FDM in accordance with the Agreement. Lawrence admitted these deficiencies to Marshall and told her that Skyward was attempting to reconcile its invoices. Skyward contended it was "in the process of submitting all past invoices."

23. In 2020, Lawrence contacted the FDM Sales Department about his issues following the Invoicing Procedures. The FDM Sales representatives reached out to both the Invoicing and Transportation representatives to seek assistance for Skyward, which they were already providing to Skyward.

24. Additionally, Villafranca with FDM personally met with a Skyward representative to help them correct the invoicing issues.

25. Beyond Lawrence's testimony, the only evidence Skyward presented at trial in attempt show that it submitted all outstanding invoices accurately, timely, and in accordance with the Agreement was Skyward's accounts receivable statement.

26. However, the accounts receivable statement does not have the Load/Trip Numbers associated with the invoices. This information was necessary so FDM could verify or investigate Skyward's claims for payment.

27. At trial Skyward did not produce copies of the invoices that it alleges FDM should have paid. These invoices are documents created by Skyward not FDM. In the absence of these invoices, the Court finds that Lawrence's testimony and the accounts receivable

statement are not persuasive or credible evidence establishing that Skyward accurately, timely and in accordance with the Agreement submitted the invoices to FDM for payment.

28. FDM was not required under the Agreement to maintain copies of Skyward's rejected invoices. FDM had a reasonable and credible explanation for their business policy of not maintaining copies of such invoices and submissions. FDM explained that to do so that to do so with so many invoices and multiple re-submissions of invoices from numerous vendors would be extremely burdensome and make their business records difficult to maintain. It was also reasonable to expect that if a carrier thought that was planning to dispute the non-payment of an invoice, the carrier would maintain their own copies of them after they were rejected. Accordingly, unpaid invoices and submissions were periodically cleared from FDM electronic records.

29. At no time did FDM ever agree to waive Skyward's compliance with the Agreement's requirements to timely and properly submit invoices in lieu of an "administrative fee" that would be taken out of each invoice to be paid.

30. On September 23, 2020, FDM cleared the Rejected and Unsubmitted Invoices pursuant to the Agreement from its electronic records. Skyward is not owed any payment on the Rejected and Unsubmitted Invoices.

**The End of Skyward's Business Relationship with FDM**

31. As part of FDM's business practice, its freight clerks review carrier invoices to determine if there are any shortages, damages, or quality issues during the shipment. If

an issue arises from the invoice and a customer initiates a complaint against the carrier, FDM withholds payment to the carrier until it completes its investigation of the issue.

32. FDM speaks to both the customer and the carrier to gather information, which could include the carrier's trailer temperature data. If the carrier's actions caused the claim, for example, the carrier's data shows it shipped the produce at the wrong temperature, the carrier is liable.

33. On May 24, 2020, the Wal-Mart Distribution Center and Sam's Club in Terrell, Texas informed FDM they would reject $19,200.06 worth of produce because Skyward delivered fruit cases above 40 degrees when regulations require 36 degrees ("Wal-Mart Hot Fruit Claims").

34. On May 24, 2020, FDM asked Skyward to provide its trailer temperature download to enable FDM to investigate the Wal-Mart Hot Fruit Claims.

35. The next day, on May 25, 2020, Wal-Mart also complained that Skyward delivered crushed fruit boxes ("Wal-Mart Crushed Fruit Claims").

36. On May 26 and 27, 2020, Villafranca with FDM followed up directly with Skyward's selected agent, vendor Convoy Servicing, to obtain Skyward's temperature download. After Villafranca reviewed Skyward's data download, he emailed Skyward asking why Skyward's trailer temperature discharge was above 40 degrees when the temperature was set to 34 degrees.

37. Convoy Servicing confirmed to FDM that: (1) Skyward's trailer was running in heat mode at various times on the date of rejected produce, (2) only one of three zones was

running later in that day, and (3) Skyward's trailer needed to be checked out by an authorized Thermo King dealer. *Id.*

38. On May 27, 2020, FDM notified Skyward that the Wal-Mart Hot Fruit Claims against Skyward were validated based on Skyward's own data, and would result in a freight claim, meaning that Skyward would not be paid for those loads.

39. Despite Convoy Servicing's findings, there was genuine dispute between FDM and Skyward regarding whether Skyward should be held responsible for the Wal-Mart Hot Fruit Claims and the Wal-Mart Crushed Fruit Claims. At trial Lawrence provided credible evidence explaining why Convoy Servicing's findings might have been inaccurate and showing that the problems with the Wal-Mart shipment might not have been Skyward's fault. Nevertheless, it is clear that at this point, the dispute required additional investigation and discussions between FDM and Skyward before it could be resolved.

40. After being notified of Convoy Servicing's findings, Lawrence informed FDM that Skyward would not make any payments toward the Wal-Mart Claims. Additionally, Lawrence told FDM he would be ready to "fight" because Skyward had delivered the produce at the correct temperature.

41. Skyward told FDM that this was FDM's "last day discriminating against Skyward" and that it had "no interest in facilitating loads at this time for [Fresh] Del Monte."

42. Skyward directed FDM to talk to its attorney because Skyward would be filing a lawsuit against FDM. Skyward also advised FDM that it had no interest in transporting FDM

loads in the future.

43. Lawrence not FDM made the decision to end the relationship between FDM and Skyward.

44. On May 28, 2020, Skyward's counsel contacted FDM and advised it not to contact Skyward "to discuss the imminent [sic] lawsuit or any other topic" going forward.

45. In response, on May 29, 2020, Robert Savage, FDM's Vice President of Transportation and Logistics, instructed FDM employees not to communicate with Skyward or use it to transport any FDM products, including free on board ("FOB") shipments from Port of Galveston. FDM also barred Skyward from accessing its facility at the Port of Galveston.

46. This is not the first time FDM has issued such instructions regarding a carrier. FDM has banned other carriers from entering its sites when necessary to avoid harm to its employees or when a company has threatened to sue FDM.

47. As part of its operations, FDM ships produce to the FDM facility in the Port of Galveston and customers can pick up shipments from that location.

48. This practice is referred to as "free on board" or "FOB" shipments. FOB customers arrange with their own carrier to pick up the product at the FDM facility in the Port of Galveston and ship it to their facility.

49. La Bodega Meat, Inc., of Farmers Branch, Texas, is a FDM FOB customer that hires carriers to pick up products from the Port of Galveston FDM facility. In its complaint, Skyward alleges that La Bodega through its affiliate Conecta, Inc. ("Conecta") hired

Skyward to transfer FDM goods from the Port of Galveston facility.

50. However, there was no contract between La Bodega, or its affiliate Conecta, and Skyward from July 1, 2018 to July 1, 2021 or from January 1, 2021 through January 1, 2024 to transport loads form the Port of Galveston. Skyward's evidence of the existence of such a contract is not credible.

51. This time period includes the time that that Skyward claims in this lawsuit that FDM interfered with a contract between La Bodega, or its affiliate Conecta, and Skyward.

52. After Skyward terminated the Agreement with FDM, the pending litigation ensued. In its complaint Skyward asserts four causes of action against FDM. First, Skyward asserts a race discrimination claim against FDM under 42 USC § 1981 alleging that FDM unlawfully engaged in the racially disparate treatment of Lawrence and Skyward with respect to the bidding process for routes, the invoice payment process and the performance of the Agreement. Skyward also asserts a retaliation claim against FDM under this statute. In support of this claim Skyward alleges that after Lawrence challenged FDM's racially discriminatory conduct, FDM unlawfully prevented Skyward from picking up any loads from FDM's Port of Galveston facility for FOB customers like La Bodega.

53. Next Skyward asserts a state law claim against FDM for breach of contract alleging that FDM unlawfully refused to pay its outstanding invoices as required by the terms of the Agreement.

54. Finally, Skyward asserts a state law claim against FDM for tortious interference with

an existing contract. In support of this claim Skyward alleges that FDM unlawfully interfered with a contract between Skyward and La Bodega by barring Skyward from using FDM's facility at the Port of Galveston.

55. FDM in turn asserts two counterclaims against Skyward arising from Skyward's delivery of produce to Wal-Mart in May 2020. First FDM asserts a state law claim against Skyward for breach of contract alleging that Skyward failed to comply with the Agreement by delivering produce to Wal-Mart at an unsafe temperature and crushed. Next FDM asserts a state law claim against Skyward for negligence alleging that Skyward owed a tort duty to deliver the produce at a safe temperature and breached that duty by failing to do so.

## CONCLUSIONS OF LAW

**Skyward's Claims.**

<u>Skyward's Race Discrimination Claim under 42 USC § 1981 Fails.</u>

56. To prevail on its § 1981 claim, Skyward must establish: (1) it is a member of a racial minority; (2) FDM sought to intentionally racially discriminate against Skyward; (3) the discrimination concerned an activity enumerated in the statute, and (4) FDM's discriminatory actions were the "but for" cause of Skyward's injury. The Supreme Court unanimously held in *Comcast Corp. v. National Association of African-American Owned Media,* _ U.S._, 140 S. Ct. 1009 (2020) that a plaintiff has the ultimate burden of showing, that race was the "but-for" cause of the plaintiff's injury. To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have

suffered the loss of a legally protected right." *Id.*

57. Skyward has not established that FDM intentionally racially discriminated against Skyward in any way or that FDM's conduct caused it any damages. Specifically, FDM did not seek to intentionally racially discriminate against Lawrence or Skyward based on Lawrence's race with respect to respect to the bidding process for the award of contracts to haul produce for DFM, invoice payment process or the performance of the Agreement.

<u>Skyward's Retaliation Claim under 42 USC § 1981 Fails.</u>

58. To establish a prima facie case of retaliation under § 1981, Skyward must show: "(1) [he] engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action." *Potseluyko v. People's Tr. Fed. Credit Union*, 4:18-CV-4010, 2020 WL 488904, at *3 (S.D. Tex. Jan. 30, 2020). Retaliation claims brought under § 1981 are governed by the *McDonnell Douglas* burden-shifting framework, discussed above. *See* T*urner v. Baylor Richardson Med. Ctr*., 476 F.3d 337, 348 (5th Cir. 2007).

59. Skyward's retaliation claim fails because there is no causal link between the alleged protected activity and the adverse action. Specifically, Lawrence's challenges to FDM's alleged racial animus did not in any way cause Skyward to be barred from FDM's facility at the Port of Galveston. Skyward's ban was the result of Skyward's litigation threats against FDM and the fact that Skyward's counsel advised FDM not to contact Skyward to "discuss the imminent [sic] lawsuit or any other topic" going forward.

Skyward's Tortiously Interference Claim Fails.

60. Skyward's complaint alleges it had a contract with La Bodega which FDM tortiously interfered with by banning Skyward from using FDM's facility at the Port of Galveston. Under Texas law, in order to succeed on a claim for tortious interference with an existing contract, plaintiff must prove: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss.[3] *See Prudential Ins. Co. of Am. v. Financial Review Serv., Inc.*, 29 S.W.3d 74, 77-78 (Tex. 2000).

61. Skyward did not have a contract with La Bodega for carrier services from the Port of Galveston during the time period it alleges that FDM tortiously interfered with this contract. Assuming this contract existed, FDM was legally justified in banning Skyward from the Port. "Even when a plaintiff presents evidence of each element of tortious interference, a defendant still may prevail by establishing the affirmative defense of justification." *St. Anthony's Minor Emer. Ctr., LLC v. Ross Nicholson 2000 Separate Prop. Tr.*, 567 S.W.3d 792, 799-800 (Tex. Ct. App. 2018) (finding that trust to which landlord assigned lease did not tortiously interfere with plaintiff's sublease agreement by locking out plaintiff because it had a contractual right to do so) (citation omitted). "A defendant generally establishes justification as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Id.*

---

[3] On October 18, 2022, the Court issued a Memorandum and Order stating "Here only one of the four causes of action, Lawrence's breach of contract claim, is premised on Florida law." Memorandum and Order at 14. [Dkt. 32].

62. Here, FDM was legally justified in terminating Skyward's access to FDM's loading docks at the FDM facility in the Port of Galveston because (1) the facility was controlled by FDM not Skyward, 2) Lawrence had made repeated litigation threats against FDM and (3) Skyward's counsel advised FDM not to contact Skyward to "discuss the imminent [sic] lawsuit or any other topic" going forward. Furthermore, despite FDM's ban on Skyward's use of FDM's loading docks, Skyward continued to use the docks without FDM's knowledge.

<u>Skyward's Breach of Contract Fails.</u>

63. The elements of breach of contract under Florida law are: (1) a valid contract; (2) a material breach; and (3) damages."[4] *Abbott Labs., Inc. v. GE Capital*, 765 So.2d 737, 740 (Fla. 5th DCA 2000) (citations omitted). "In breach of contract actions, a plaintiff may recover only if the damages were a proximate result of the breach." *Chipman v. Chonin*, 597 So.2d 363, 364 (Fla. 3d DCA 1992).

64. Under well-established contract law, "[a] condition precedent is an act or event, other than a lapse of time, that must occur before a binding contract will arise." *Land Co. of Osceola Cty., LLC v. Genesis Concepts, Inc.*, 169 So.3d 243, 247 (Fla. 4th DCA 2015).

65. To establish a prima facie case of breach of contract, Skyward must show: (1) it had a valid contract with FDM; (2) Skyward met the condition precedent for FDM to perform under the contract; (3) FDM material breached the contract; and (4) FDM's material

---

[4] On October 18, 2022, the Court issued a Memorandum and Order stating "Here only one of the four causes of action, Lawrence's breach of contract claim, is premised on Florida law." Memorandum and Order at 14. [Dkt. 32].

breach resulted in damages to Skyward.

66. Skyward has failed to establish that it complied with all conditions precedent under the Agreement for the payment of its invoices. Specifically, Skyward failed to establish that it submitted all outstanding invoices to FDM accurately, timely, and in accordance with the Agreement. Thus, Skyward has failed to establish that FDM's failure to pay Skyward's outstanding invoices was a breach of the Agreement.

**FDM's Claims**

FDM's Breach of Contract Fails

67. To establish a prima facie case of breach of contract, FDM must show: (1) it had a valid contract with Skyward; (2) FDM met the condition precedent for Skyward to perform under the contract; (3) Skyward materially breached the contract; and (4) Skyward's material breach resulted in damages. Skyward will present evidence to establish all four elements.

68. FDM has not established that Skyward failed to deliver produce to Wal-Mart in the promised condition as required by the Agreement. Thus, FDM has failed to establish that Skyward breached the Agreement.

FDM's Negligence Claim Fails

69. FDM's negligence cause of action is governed by Florida state law. The elements for a negligence claim under Florida law are: (1) a duty to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the breach and injury; and (4) loss or damage. *Lago v. Costco Wholesale Corp*., 233 So. 3d 1248, 1250

(Fla. 3d DCA 2017).

70. FDM has not established that Skyward failed to use reasonable care to deliver produce to Wal-Mart at the correct temperature or in the promised condition. FDM has also not established that Skyward failed use reasonable care to protect, preserve, store and transport the produce to Wal-Mart. Thus, FDM has failed to establish that Skyward's negligence caused product damage that resulted in the Wal-Mart Hot Fruit Claims and the Wal-Mart Crushed Fruit Claims.

71. Having considered the evidence, arguments of counsel at trial, and applicable law, the Court finds neither FDM nor Skyward have prevailed on their claims in this case. Accordingly, neither party is entitled to recover any damages in this action. The Court will enter a final judgment consistent with these findings of fact and conclusions of law.

SIGNED in Houston, Texas this 28th day of March, 2024.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE